Slip Op. 20-7

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SAO TA FOODS JOINT STOCK COMPANY ET AL., **Plaintiffs and Consolidated Plaintiff,** v. UNITED STATES, **Defendant,** and AD HOC SHRIMP TRADE ACTION COMMITTEE, **Defendant-Intervenor and Consolidated Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge** **Consol. Court No. 18-00205** **PUBLIC VERSION** |

### OPINION AND ORDER

[Sustaining in part and remanding in part the U.S. Department of Commerce's final results in the twelfth administrative review of the antidumping duty order covering frozen warmwater shrimp from the Socialist Republic of Vietnam.]

Dated: January 16, 2020

Matthew R. Nicely and Daniel M. Witkowski, Hughes Hubbard & Reed LLP, of Washington, DC, argued for plaintiffs Sao Ta Foods Joint Stock Company, et al.

Robert G. Gosselink, Trade Pacific, PLLC, argued for consolidated plaintiff Mazzetta Company, LLC.  With him on the brief was Aqmar Rahman.

Kara M. Westercamp, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for defendant.  With her on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director.  Of counsel was Natan P.L. Tubman, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

Nathaniel Maandig Rickard and Zachary J. Walker, Picard, Kentz & Rowe, LLP, of Washington, DC, argued for defendant-intervenor Ad Hoc Shrimp Trade Action Committee.

Kelly, Judge:  This action is before the court on motion for judgment on the agency

record.  <u>See</u> Consol. Pl.'s R. 56.2 Mot. J. Agency Rec., Mar. 15, 2019, ECF No. 26; Pls.'

R. 56.2 Mot. J. Agency Rec., Mar. 15, 2019, ECF No. 28.  Plaintiffs Sao Ta Foods Joint

Stock Company, a.k.a. Fimex VN ("Fimex"), et al. (collectively, "Vietnamese

Respondents") and Consolidated Plaintiff Mazzetta Company, LLC ("Mazzetta")

challenge various aspects of the U.S. Department of Commerce's ("Department" or

"Commerce") final determination in the antidumping duty ("ADD") review of certain frozen

warmwater shrimp from the Socialist Republic of Vietnam ("Vietnam").[1]  <u>See</u> <u>Certain</u>

<u>Frozen Warmwater Shrimp From [Vietnam]</u>, 83 Fed. Reg. 46,704 (Dep't Commerce Sept.

14, 2018) (final results of [ADD] admin. review, 2016–2017) ("<u>Final Results</u>"), and

accompanying Issues & Decision Memo. for the Final Results, Sept. 7, 2018, ECF No. 45

("Final Decision Memo.").

Vietnamese Respondents and Mazzetta commenced separate actions pursuant to

Section 516A(d) of the Trade Act of 1930, 19 U.S.C. § 1516a(d), and 28 U.S.C. § 2631(c)

(2012),[2] which were later consolidated.  <u>See</u> Summons, Oct. 1, 2018, ECF No. 1; Compl.

at ¶ 4, Oct. 2, 2018, ECF No. 7; Order, Dec. 14, 2018, ECF No. 23 (consolidating Ct. No.

18-00205 and Ct. No. 18-00207 under Ct. No. 18-00205).  Vietnamese Respondents and

Mazzetta challenge Commerce's selection of Bangladeshi NACA data as the "best

---

[1] Vietnamese Respondents are foreign producers and exporters of frozen warmwater shrimp from
Vietnam.  <u>See</u> Compl. at ¶ 6.  Mazzetta is an importer and distributor of subject merchandise.
<u>See</u> Compl. at ¶ 2, Oct. 9, 2018, ECF No. 8 (from associated docket Ct. No. 18-00207).

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19
of the U.S. Code, 2012 edition.

available information" to value Fimex's vannamei shrimp input in the raw shrimp factor of

production ("FOP") as unsupported by substantial evidence and not in accordance with

law.  See Pls.' Confid. Memo. Supp. R. 56.2 Mot. J. Agency Rec. at 1, 9–24, Mar. 15,

2019, ECF No. 29 ("Pls.' Br."); Memo. Supp. Mot. [Mazzetta] J. Agency R. at 1–2, 9–31,

Mar. 15, 2019, ECF No. 26 ("Consol. Pl.'s Br.").  Vietnamese Respondents separately

contest Commerce's determination not to grant separate rate status to certain factory and

trade names as unsupported by substantial evidence and not in accordance with law.

See Pls.' Br. at 1, 24–46.  Defendant and Defendant-Intervenor Ad Hoc Shrimp Trade

Action Committee ("AHSTAC") request the court to uphold the Final Results in their

entirety.  See Def.'s Opp'n Pls.' & Consol. Pl.'s Mots. J. Agency Rec. at 2, 14–44, June

21, 2019, ECF No. 34 ("Def.'s Br."); Def.-Intervenor [AHSTAC's] Resp. Pls.' & [Consol.

Pl.'s] Mots. J. Agency Rec. at 1–2, 8–31, June 21, 2019, ECF No. 33 ("Def.-Intervenor's

Br.").  For the reasons set forth below, the court sustains Commerce's selection of

Bangladeshi NACA data as the best available information to value the raw shrimp FOP

and its denial of separate rate status to the name "Sao Ta Foods Joint Stock Company";

however, the court remands for further explanation or reconsideration Commerce's denial

of separate rate status to the factory names "Frozen Seafoods Factory No. 32" and

"Seafoods and Foodstuffs Factory."[3]

---

[3] Vietnamese Respondents confirmed, during oral argument, that they had waived arguments
regarding Commerce's denial of separate rate status to Camau Seafood Factory No. 4, which
they had included in their complaint but had not raised in their opening brief.  See Oral Arg. at
1:32:38–1:32:44; see also Compl. at ¶¶ 26–28.  As a result, the court will not review this issue.

## BACKGROUND

On April 10, 2017, Commerce initiated the twelfth administrative review[4] of the antidumping duty order covering frozen shrimp from Vietnam.  See <u>Initiation of Antidumping and Countervailing Duty Admin. Reviews</u>, 82 Fed. Reg. 17,188, 17,194–95 (Dep't Commerce Apr. 10, 2017) ("Initiation").  Commerce selected Fimex as a mandatory respondent.[5]

On March 12, 2018, Commerce published its preliminary results.  See <u>Certain Frozen Warmwater Shrimp From [Vietnam]</u>, 83 Fed. Reg. 10,673 (Dep't Commerce Mar. 12, 2018) (prelim. results of [ADD] admin. review & prelim. determination of no shipments; 2016–2017) ("<u>Prelim. Results</u>"), and accompanying Decision Memo. for Prelim. Results of [ADD] Admin. Review, A-552-802, Mar. 5, 2018, <u>available at</u> https://enforcement.trade.gov/frn/summary/vietnam/2018-04901-1.pdf (last visited Jan. 9, 2020) ("Prelim. Decision Memo.").  Given that Commerce considers Vietnam to be a non-market economy ("NME") country, Commerce determined normal value using surrogate values ("SVs") from a surrogate market economy country, preliminarily selecting Bangladesh as the primary surrogate country to value Fimex's FOPs.  See

---

[4] The twelfth administrative review covers the period February 1, 2016 to January 31, 2017 ("period of review" or "POR").  <u>See</u> Initiation, 82 Fed. Reg. at 17,194.

[5] Initially, Commerce also selected Soc Trang Seafood Joint Seafood Company, a.k.a. Stapimex, as a mandatory respondent.  <u>See</u> Selection of Respondents for Individual Examination at 5, PD 83, bar code 3574447-01 (May 23, 2017).  Given that petitioners subsequently withdrew their requests for administrative review of Stapimex, Commerce, too, rescinded its review of Stapimex, leaving Fimex as the sole mandatory respondent.  <u>See Certain Frozen Warmwater Shrimp from [Vietnam]</u>, 82 Fed. Reg. 37,563, 37,563 (Dep't Commerce Aug. 11, 2017) (partial rescission of [ADD] admin. review; 2016–2017); <u>see also</u> Prelim. Decision Memo. at 3.

Prelim. Decision Memo. at 6, 12–17.  In making this selection, Commerce evaluated the availability of data in that surrogate country.  Id. at 14–17.  It considered the value of the main input, head-on, shell-on fresh shrimp ("raw shrimp"), to be "the critical FOP" in the calculation of normal value, and it selected data from Bangladesh reported in a study by the Network of Aquaculture Centers in Asia-Pacific ("Bangladeshi NACA data") to value that FOP.  See id. at 15–16.  Commerce acknowledged that even though the Bangladeshi NACA data pertained only to one species of shrimp, black tiger, and Fimex produced and sold two species of shrimp, black tiger and vannamei, the Bangladeshi NACA data catalogued raw shrimp prices by count-size, like the subject merchandise and reported input.  Id. at 16, 23.

Commerce also preliminarily granted separate rate ("SR") status to Fimex's trade name, "Fimex VN," but denied separate rate status to certain other trade names, including Fimex's name "Sao Ta Foods Joint Stock Company" and two factory names of Thuan Phuoc Seafoods and Trading Corporation ("Thuan Phuoc").  See id. at 9–10, 28.  In an accompanying memorandum, Commerce elaborated on why it had declined to grant separate rate status to certain trade names.  See Names Not Granted [SR] Status at the Prelim. Results, PD 225, bar code 3679580-01 (Mar. 5, 2018) ("Trade Names Memo.").[6] Specifically, Commerce denied SR status to the name "Sao Ta Foods Joint Stock Company," because it was not used on export documents during the POR.  Id. at 4–5.

---

[6] On November 13, 2018, Defendant filed indices to the public and confidential administrative records underlying Commerce's final determination to the docket at ECF 19-2–3.  Citations to the administrative record in this opinion are to the numbers Commerce assigned to such documents in the indices.

Further, because neither "Frozen Seafoods Factory No. 32" nor "Seafoods and Foodstuffs Factory" were listed on respective valid business registration certificates ("BRCs"), Commerce also denied SR status to those factory names.  Id. at 4.

On September 14, 2018, Commerce published its final results.  See generally Final Results.  It continued to find Bangladeshi NACA data the best available information to value raw shrimp and to deny separate rate status to certain trade and factory names. See Final Decision Memo. at 6–14, 16–23.  Commerce elaborated on its reasons to favor Bangladeshi NACA data over another source, data from Indonesia reported in the same NACA study ("Indonesian NACA data"), that included prices of both black tiger shrimp and vannamei shrimp but covered fewer count-sizes than the Bangladeshi NACA data. See id. at 6–14.  In addition, Commerce further explained its reasons for rejecting certain trade and factory names.  See id. at 16–23.  Commerce assigned Fimex a weighted-average dumping margin of 4.58 percent, and also applied that margin to non-examined respondents granted separate-rate status.  Final Results, 83 Fed. Reg. 46,705–06. Commerce assigned companies not granted SR status the Vietnam-wide entity rate.  Id. at 46,705.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) and 28 U.S.C. § 1581(c) (2012), which grant the court authority to review actions contesting the final determination in an review of an ADD order.  The court will uphold Commerce's determination unless it is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).

## DISCUSSION

### I.  Commerce's Selection of Bangladeshi NACA Data to Value Raw Shrimp

Vietnamese Respondents' and Mazzetta's challenge to Commerce's selection of Bangladeshi NACA data as the best available information to value Fimex's vannamei shrimp input proceeds from the premise that Commerce had not one generic raw shrimp FOP but two species-specific FOPs to value.  See Pls.' Br. at 9–24; Consol. Pl.'s Br. at 12–30.[7]  Both allege that Commerce's determination is unsupported by substantial evidence and not in accordance with law, because the Indonesian NACA data, which reports both vannamei and black tiger shrimp prices, was more specific than the Bangladeshi NACA data to value the vannamei shrimp FOP.  See Pls.' Br. at 9–24; Consol. Pl.'s Br. at 12–30.  Moreover, they contend that Commerce ignored detracting evidence that indicated the Bangladeshi NACA data was not the best available information on the record.  See Pls.' Br. at 11–22; Consol. Pl.'s Br. at 16–30.  Defendant and AHSTAC counter that Commerce reasonably determined that the Bangladeshi NACA data was the best available information on the record.  See Def.'s Br. at 16–31; Def.-Intervenor's Br. at 9–22.  For the reasons that follow, Commerce reasonably determined

---

[7] Vietnamese Respondents and Mazzetta only challenge Commerce's selection of Bangladeshi NACA data to value vannamei shrimp with data that cover black tiger shrimp prices.  Neither contests Commerce's application of Bangladeshi NACA data to value Fimex's black tiger shrimp input.  See Pls.' Br. at 10 n.49; see also Consol. Pl.'s Br. at 11.  They argue that Commerce had not one generic raw shrimp FOP but two species-specific FOPs to value.  See also Consol. Pl.'s Br. at 28–30; see also Oral Arg. at 4:45–6:09, 7:20–8:40.

there was one raw shrimp FOP, and its selection of Bangladeshi NACA data to value that FOP is supported by substantial evidence and in accordance with law.

In an antidumping proceeding, if Commerce considers an exporting country to be an NME, like Vietnam, it will identify one or more market economy countries to serve as a "surrogate" for that NME country in the calculation of normal value.[8]  See 19 U.S.C. § 1677b(c)(1), (4).  Normal value is determined on the basis of FOPs from the surrogate country or countries used to produce subject merchandise.  See id. at § 1677b(c)(1). FOPs to be valued in the surrogate market economy include "hours of labor required," "quantities of raw materials employed," "amounts of energy and other utilities consumed," and "representative capital cost, including depreciation."  See id. at § 1677b(c)(3).

By statute, Commerce must value FOPs "to the extent possible . . . in one or more market economy countries that are . . . at a level of economic development comparable to that of the [NME], and . . . significant producers of comparable merchandise."  See id. at § 1677b(c)(4)(A)–(B).[9]  When several countries are at a level of economic development comparable to the NME country and are significant producers of comparable merchandise, Commerce evaluates the reliability and completeness of the data in these

---

[8] Dumping occurs when merchandise is imported into the United States and sold at a price lower than its "normal value," resulting in material injury (or the threat of material injury) to the U.S. industry.  See 19 U.S.C. §§ 1673, 1677(34), 1677b(a).  The difference between the normal value of the merchandise and the U.S. price is the "dumping margin."  See id. at § 1677(35).  When normal value is compared to the U.S. price and dumping is found, antidumping duties equal to the dumping margin are imposed to offset the dumping.  See id. at § 1673; see generally Dorbest Ltd. v. United States, 604 F.3d 1363, 1367 (Fed. Cir. 2010).

[9] This analysis is designed to determine a producer's costs of production in an NME as if that producer operated in a hypothetical market economy.  See, e.g., Downhole Pipe & Equipment, L.P. v. United States, 776 F.3d 1369, 1375 (Fed. Cir. 2015); see also 19 U.S.C. § 1677b(c)(1)(B).

similarly situated countries and generally selects the one with the best data as the primary surrogate country.  See Import Admin., U.S. Dep't Commerce, Non-Market Economy Surrogate Country Selection Process, Pol'y Bulletin 04.1 (2004), available at http://enforcement.trade.gov/policy/bull04-1.html (last visited Jan. 9, 2020) ("Policy Bulletin 04.1"). Commerce prefers to use data from one primary surrogate country. See 19 C.F.R. § 351.408(c)(2) (2017).

Section 1677b requires Commerce to use "the best available information" to value FOPs.  19 U.S.C. § 1677b(c)(1).  Although Commerce has broad discretion in deciding what constitutes the best available information, see QVD Food Co. v. United States, 658 F.3d 1318, 1323 (Fed. Cir. 2011) (noting the absence of a definition for "best available information" in the AD statute), it must ground its selection of the best available information in the overall purpose of the antidumping statute, calculating accurate dumping margins.  See CS Wind Vietnam Co. v. United States, 38 CIT __, __, 971 F. Supp. 2d 1271, 1277 (2014) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).  "Commerce generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review" (collectively, "selection criteria"). Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014); see also Policy Bulletin 04.1.

An agency's determination is supported by substantial evidence when there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1379 (Fed. Cir. 2003) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The "substantiality of evidence must take into account whatever in the record fairly detracts from its weight." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Nevertheless, "the possibility of drawing two inconsistent conclusions from the evidence does not invalidate Commerce's conclusion as long as it remains supported by substantial evidence on the record." Zhaoqing New Zhongya Aluminum Co. v. United States, 36 CIT 1390, 1392, 887 F. Supp. 2d 1301, 1305 (2012) (citing Universal Camera Corp., 340 U.S. at 488).

Commerce's determination to value Fimex's raw shrimp FOP, including the vannamei shrimp input, with Bangladeshi NACA data is supported by substantial evidence and in accordance with law.[10] First, despite Vietnamese Respondents' and Mazzetta's position that Commerce should value vannamei shrimp with a separate SV for black tiger shrimp, Commerce reasonably determined there was one raw shrimp FOP. See Final Decision Memo. at 9. By statute, Commerce has discretion to identify FOPs, see 19 U.S.C. § 1677b(c)(3) ("[T]he [FOPs] utilized in producing merchandise include, but are not limited to . . . quantities of raw materials employed[.]"), as well as discretion to identify the best available information to value those FOPs. See id. at § 1677b(c)(1)

---

[10] Commerce only applied the Bangladeshi NACA data to value Fimex's raw shrimp input, because it had separately valued FOPs at the farming stage and applied a different SV to frozen shrimp. See Analysis for the Final Results for Fimex VN at 3, CD 335, bar code 3752461-01 (Sept. 7, 2018).

**PUBLIC VERSION**

("[T]he valuation of the [FOPs] shall be based on the best available information[.]").  The

term "best available information" is not defined.  See QVD Food Co., 658 F.3d at 1323.

Commerce, therefore, defines the FOPs, based on information that it uncovers in an

investigation or review, and selects the best available information to value that FOP.

However, limiting that discretion, Commerce's determination must be reasonable and

based upon the record evidence.  See 19 U.S.C. § 1516a(b)(1)(B)(i).  Notably in this case,

Fimex, in response to Commerce's request to explain the materials used in the production

process and methods to calculate each input, reported that the raw shrimp materials

included "purchased frozen shrimp from domestic sources, purchased frozen shrimp from

imports, and purchased raw shrimp and shrimp which comes from the Fimex farm."  See

Fimex VN's Resp. Section D Questionnaire at D-22, PD 164, bar code 3593103-01 (July

13, 2017) ("Fimex's SDQR").  Fimex explained that its raw shrimp inputs were reported

by count-size; it did not specifically identify raw vannamei shrimp and black tiger shrimp

as separate FOPs.  See id. at D-23.[11]  Commerce reasonably treated raw shrimp as a

single FOP, of which vannamei shrimp and black tiger shrimp were constituent inputs.

---

[11] As discussed above, Vietnamese Respondents and Mazzetta are not arguing that Commerce
should use Indonesian NACA data to value all raw shrimp; rather, they contend that Commerce
should value vannamei shrimp with Indonesian NACA data and black tiger shrimp with
Bangladeshi NACA data.  Therefore, they view each species as a separate FOP.  See Oral Arg.
at 4:45–6:09, 7:20–8:40.  Indeed, Mazzetta considers each product characteristic reflected in the
CONNUMs, or control numbers, corresponds to a distinct FOP.  Id. at 10:33–10:46.  Vietnamese
Respondents keenly observe that these characteristics are "baked in" to the valuation of the
subject merchandise, because the characteristics are part of the control number and, therefore,
integral in the comparison of normal value to export price.  See id. at 12:28–12:55.  However,
Mazzetta does not persuade in suggesting that each characteristic reflected in each CONNUM
itself represents a singular FOP. The CONNUM relates to the finished product. The statute

(footnote continued)

Second, given that Commerce had one raw shrimp FOP to value, it reasonably

determined that the Bangladeshi NACA data was the best available information on the

record, because it was most specific to that FOP.  Although the Bangladeshi NACA data

encompassed only black tiger shrimp prices, and the Indonesian NACA data reported

both vannamei and black tiger shrimp prices, the Bangladeshi NACA data, unlike the

Indonesian NACA data, reported a larger range of raw shrimp prices by count-size.[12]  See

---

identifies the FOPs as inter alia "quantities of raw materials employed," see 19 U.S.C.
§ 1677b(c)(3), and directs Commerce that the "valuation of the factors of production shall be
based on the best available information[.]"   Id. at § 1677b(c)(1).   Moreover, treating each
characteristic as a distinct FOP—be it species, count-size, cooked/raw, or de-veined/veined—
could unduly complicate the exercise in requiring Commerce to apply its selection criteria to
each—and to potentially look far beyond data in the primary surrogate country, thus introducing
distortions.

[12] Commerce explained that record evidence indicated that count-size was more important than
species in pricing raw shrimp.  See Final Decision Memo. at 12–13; see also Final Calc. Memo.
at 7–8.  In the underlying proceeding—and in response to Vietnamese Respondents' comments—
Commerce considered whether, as alleged, species, rather than count-size, was more price
determinative for raw shrimp.  See Final Decision Memo. at 12–13.  First, Commerce examined
the Bangladeshi and Indonesian NACA data sets as well as Fimex's raw sales data.  See id.
(citing Final Calc. Memo. at 7).  Commerce considered that the NACA data indicated a pricing
relationship with count-size but not with species.  Id. at 12.  Second, in its review of Fimex's raw
sales data, Commerce noted that the "pricing structure of both black tiger shrimp and vannamei
shrimp, by count-size, is more distinct and predictable than the pricing structure between the two
species of the same count-size."  Final Calc. Memo. at 7; see also Final Decision Memo. at 12–
13.  Before the court, Vietnamese Respondents argue that, with respect to Commerce's analysis
of the NACA data sets, Commerce wrongly discerned a relationship of price and count-size in the
NACA data itself, and also contend that if Commerce controlled for other physical characteristics
in its analysis of Fimex's sales data, then a relationship between shrimp species and price would
be revealed.  See Pls.' Br. at 18–22; see also Consol. Pl.'s Br. at 24–26.  Yet even if, as
Vietnamese Respondents allege, this analysis is flawed, see Pls.' Br. at 18–22; Consol. Pl.'s Br.
at 24–26, Commerce also considered the distortive effects of extrapolation using data that did not
capture all reported count-sizes and data from a tertiary surrogate country.  See Final Decision
Memo. at. 6–12, 13–14.  Thus, given these other concerns, and the importance of count-size
specificity, Commerce reasonably determined, from the totality of the evidence, that the

(footnote continued)

Final Decision Memo. at 8, 11–12; see also VASEP SV Info. at Ex. SV-2, PD 187–88, bar code 3605123-01 (Aug. 7, 2017).[13]   Specifically, reviewing Fimex's raw shrimp allocation data, Commerce observed that Fimex reported raw shrimp inputs by fifteen different count-sizes.  Final Decision Memo. at 11.  The Bangladeshi NACA data would cover nine of those fifteen count-sizes, and the Indonesian NACA data would cover only five count-sizes.  Id.  Commerce reasonably "place[d] greater weight" on count-size, than species, because the subject merchandise and the raw shrimp input were both reported by count-size.  Id. at 8.

Commerce also explained its concern that using the Indonesian NACA data would result in more extrapolation of SVs in the calculation of normal value than applying the Bangladeshi NACA data.  Fimex calculated its raw shrimp consumption by count-size[14] using a "mix ratio" of different count-size bands, meaning that Fimex may have consumed a mix of different count-sizes to produce a final product falling within a single count-size

---

Bangladeshi NACA data was the best available information to value the raw shrimp input.  See id. at 7–8; see also Shandong Huarong Gen. Corp. v. United States, 25 CIT 834, 837, 159 F. Supp. 2d 714, 718 (2001) ("[T]he Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion.").

[13] Commerce also noted that the NACA study containing shrimp prices from Bangladesh were a "reliable and objective source of fresh, whole shrimp prices available to the public" that it had used in prior administrative reviews.  Final Decision Memo. at 8 (citing Prelim. Decision Memo. at 15).

[14] Specifically, Fimex reported its raw shrimp by the field "RMX," where "X" corresponds to the number of raw shrimp ("count-size") pieces in one pound.  See Fimex's SDQR at D-17–18.  For example, "RM02" comprises 8 to 12 pieces of shrimp per pound, while RM14 designates 201 to 300 pieces of shrimp per pound.  See id. at D-18.  Fimex had designated its frozen and farmed shrimp inputs with different RM variables, "RM_FARM" and "RM_FROZEN" respectively.  Id. at D-22–23.

band.[15]  See Final Decision Memo. at 11 n.49; Analysis for the Final Results for Fimex

VN at 5, CD 335, bar code 3752461-01 (Sept. 7, 2018) ("Final Calc. Memo.") (citing

Fimex's SDQR at D-24).  As a result, the count-sizes consumed do not fully correspond

to the count-sizes sold.   See Final Decision Memo. at 5; Final Calc. Memo. at 5.[16]

Commerce estimated, that due to the mix ratio reporting and the necessity to extrapolate

data to fill in the count-size bands not covered by the NACA data sets, it would, in turn,

rely on extrapolated SVs for some of Fimex's sales observations.  See Final Decision

Memo. at 11; Final Calc. Memo. at 5.   Commerce calculated that far more sales

observations would require extrapolation using the Indonesian NACA data as opposed to

the Bangladeshi NACA data.[17]  See id.  Commerce further noted that the extrapolation of

smaller count-sizes only, required by both data sets, would have less impact on the

calculation of normal value, than the additional extrapolation of higher-value, larger count-

---

[15] Commerce provided the following example: "[T]he RM mix for black tiger shrimp . . . which was sold under reported count-size code [[   ]] denoting a count size range of [[       ]] corresponds to the reported RM codes mix ratio of [[            ]].  Thus, a count-size range of [[        ]] sold is not strictly composed of those exact shrimp sizes in the reported FOP database, and the normal value for this CONNUM is composed of SVs for all [[        ]] RM codes as the mix ratio to produce the count-size range sold: [[       ]], denoted as only SIZEU [[    ]] in the sales data." Final Calc. Memo. at 5 (citing Fimex's SDQR at D-24).

[16] To illustrate this point, Vietnamese Respondents note that "Fimex might have consumed a mix of RM03, RM04, and RM05 to produce a final product with a count-size falling within RM04."  Pls.' Br. at 15.

[17] Commerce noted that "[[    ]] sales (roughly 63 percent) of Fimex's [[    ]] sales observations of vannamei are composed of RM mix ratios that would require extrapolation if Indonesia[n] NACA SV data were used.  Conversely, . . . using the Bangladeshi NACA SV data, we used extrapolated SV data for only RM10 through RM15, which accounts for [[     ]] sales (roughly [[   ]] percent) of Fimex's [[    ]] sales of vannamei, based on the mix ratios reported for sales of SIZEU 10, 11, 13, 15, and 17."  Final Calc. Memo. at 5.

size raw shrimp required only by the Indonesian NACA data.[18]  See Final Decision Memo.

at 11. Therefore, the Bangladeshi NACA data would require less extrapolation, and risk

less distortion, in the calculation of normal value than the Indonesian NACA data.  Id. at

9–12.

Moreover, Commerce reasonably sought to further limit possible distortion that

could be introduced by resorting to a tertiary surrogate country's data.[19]  Commerce

---

[18] Vietnamese Respondents take issue with Commerce's characterization of the extent of extrapolation required by the Indonesian NACA data.  According to Plaintiffs, using the Indonesian NACA data would mean that "[s]ixty-three percent of vannamei sales would include an input with a count-size requiring an extrapolated SV[,]" not that "63 percent of the count-sizes used to produce vannamei sales to the United States would require an extrapolated SV."  Pls.' Br. at 15.  Vietnamese Respondents seem to be parsing Commerce's statement that "[w]e also note that [[        ]] sales (roughly 63 percent) of Fimex's [[        ]] sales observations of vannamei are composed of RM mix ratios containing RMs that would require extrapolation if Indonesia NACA SV data were used."  However, in the very next sentence, Commerce notes that "using the Bangladeshi NACA SV data, we used extrapolated SV data for only RM10 through RM15, which accounts for [[        ]] sales (roughly [[        ]] percent) of Fimex's [[        ]] sales of vannamei, based on the RM mix ratios reported for sales of SIZEU 10, 11, 13, 15, and 17."  See Final Calc. Memo. at 5; see also Final Decision Memo. at 11 n.49.  Thus, it is reasonably discernable that Commerce expressed a concern about the inclusion of an extrapolated count-size input in Fimex's vannamei sales observations.

Moreover, Plaintiffs do not appear to dispute the 63 percent figure—and indeed correct the calculated percentage to 63.6—but focus on the potential impact of extrapolation on normal value.  See Pls.' Br. at 15–17 & n.65.  Plaintiffs estimate from Fimex's shrimp consumption volumes that using the Indonesian NACA data results in only an additional [[        ]] of vannamei shrimp, by volume, to be valued using extrapolated data.  Id. at 17.  However, as noted above, Commerce expressed concern about the inclusion of extrapolated SVs with respect to Fimex's sales observations.  See Final Calc. Memo. at 5.  Even accepting Plaintiffs' calculation, they acknowledge that their estimate of [[        ]] additional extrapolation "would be spread across several final products."  See Pls.' Br. at 17.  The use of the Indonesian NACA data would result in more extrapolation, in terms of sales observations and by volume, and Commerce has discretion to minimize any distortive effect.

[19] Commerce, however, used data from India to value four non-shrimp FOPs for which Bangladesh could not provide SVs (i.e., shrimp scrap byproduct, shrimp larvae, shrimp feed, and labor).  See Final Decision Memo. at 8 (citing Prelim. Decision Memo. at 3, 6, 9).  Commerce explained that India was at the same level of economic development as Vietnam.  See Prelim. Decision Memo. at 24.  Moreover, Commerce considered the data from India to value these FOPs to be more specific than other data sources on the record.  See id.

determined that Bangladesh fulfilled the statutory requirements and its selection criteria to be the primary surrogate country, unlike Indonesia.  See Prelim. Decision Memo. at 13–17.[20]   Although Commerce looks to other countries to find the best available information to value a FOP where data from the primary surrogate country is unavailable or unreliable, see, e.g., Jiaxing Brother Fastener Co. v. United States, 38 CIT __, __, 11 F. Supp. 3d 1326, 1332–33 (2014), here, Commerce reasonably determined that the Bangladeshi NACA data is a reliable SV data source.  See Final Decision Memo. at 8 (citing Prelim. Decision Memo. at 15).   Commerce's determination is supported by its reasonable concern that using data sources from multiple countries would potentially lead to distortive and inaccurate calculations.  See id. at 13–14.  In the absence of any authority requiring it to use data from multiple countries to value raw shrimp, Commerce chose to value the raw shrimp FOP with data from the primary surrogate country Bangladesh.  See 19 C.F.R. § 351.408(c)(2).   Commerce's explanation for its refusal to supplement the Bangladeshi data is reasonable.

Vietnamese Respondents' and Mazzetta's arguments that Commerce erroneously emphasized count-size specificity to the sacrifice of species specificity are unavailing,

---

[20] Bangladesh met the statutory criteria under 19 U.S.C. § 1677b(c)(4)(A)–(B) as a country at the same level of economic development as Vietnam and as a significant producer of comparable merchandise.  See Prelim. Decision Memo. at 13–14, 17; see also Final Decision Memo. at 6–7. Further, consistent with its selection criteria, Commerce found Bangladesh to provide the best available SV information for most FOPs, including, in its view, "the critical FOP" raw shrimp.  Final Decision Memo. at 7 (citing Prelim. Decision Memo. at 15).  Moreover, only Bangladesh, unlike other countries under consideration, had SV information for direct materials and surrogate financial statements.   Prelim. Decision Memo. at 15.   Therefore, Mazzetta's argument that Indonesia is a legally permissible surrogate country is misplaced, as Commerce found that only Bangladesh fulfilled the statutory requirements and its selection criteria.  See Consol. Pl.'s  Br. at 14–16.

because their contentions proceed from the erroneous premise that Commerce had two species-specific FOPs to value.[21]  See Pls.' Br. at 9–24; Consol. Pl.'s Br. at 12–30;  see also Pls.' Confidential Reply Supp. R. 56.2 Mot. J. Agency Record at 2 & n.2, ECF No. 42, Aug. 16, 2019 ("Pls.' Reply Br."); [Consol. Pl.'s] Reply Br. Supp. Mot. J. Agency R. at 2, 16, ECF No. 41, Aug. 16, 2019 ("Consol. Pl.'s Reply Br.").  According to Vietnamese Respondents, Commerce, "[i]n exchange for count-size specificity for less than [[

        ]] of Fimex's fresh shrimp input, [it] sacrificed species specificity for [[

]] of the fresh shrimp that Fimex consumed" when using the Bangladeshi NACA data. Pls.' Br. at 17.[22]  Mazzetta similarly avers that "the trade-off for not using surrogate values that were specific to all of the white vannamei"  was slightly less extrapolation.  Consol. Pl.'s Br. at 22.[23]  Here, however, Commerce reasonably selected raw shrimp as a single

---

[21] Vietnamese Respondents, during oral argument, cited to Commerce's seventh administrative review in this investigation as authority for species-specific FOPs. See Oral Arg. at 35:10–35:40; see also Certain Frozen Warmwater Shrimp from [Vietnam], 78 Fed. Reg. 56,211 (Sept. 12, 2013) (final results of [ADD] admin. review, 2011-2012), and accompanying Issues and Decision Memo. for the Final Results, Sept. 6, 2013, available at https://enforcement.trade.gov/frn/summary/vietnam/2013-22228-1.pdf (last visited Jan. 9, 2020) ("AR7 Final Decision Memo.").  Plaintiffs are mistaken. In that review, Commerce did not treat vannamei and black tiger shrimp as separate FOPs; rather, Commerce determined that the Indian data on the record, compared to the Indonesian data, was less specific in terms of both species and count-size, reporting just one count-size of vannamei shrimp. See AR7 Final Decision Memo. at 9–10.  Commerce selected the Indonesian NACA data to value the raw shrimp input and was able to parse the data, by both count-size and species.  See id.

[22] Specifically, Fimex consumed approximately 80% vannamei shrimp compared to 20% black tiger shrimp.  See Final Calc. Memo. at 4.

[23] Mazzetta also argues that when Commerce incorporates physical characteristics into its control number, it must consider which data "reflect all of those characteristics[.]"  See Consol. Pl.'s Reply Br. at 15; see also Oral Arg. at 10:33–10:46.  Here, Commerce did select data that reflect the physical characteristics in the CONNUM, inclusive of count-size and species.  See Final Decision Memo. at 9.

(footnote continued)

FOP, and reasoned that the most important characteristic to specifically value this single FOP was count-size.  As discussed above, Commerce reasonably determined that the Bangladeshi NACA data offered greater coverage as to count-size and had the benefit of being from the primary surrogate country.  See Final Decision Memo. at 9, 11, 13–14. The court cannot say that Commerce's choice to elevate count-size specificity and to select Bangladeshi NACA data to value the raw shrimp FOP is unreasonable on this record.  Commerce has discretion to make trade-offs in selecting the best available information to value FOPs, and, here, reasonably determined that for what the Bangladeshi NACA data lacked in species-specific coverage of both the vannamei and black tiger shrimp species was counterbalanced by wider count-size coverage.  See id. at 9–11.  Both the Bangladeshi and Indonesian NACA data sets were incomplete by not reporting all count-sizes and/or reflecting all species.  Commerce, in selecting between two imperfect choices, reasonably "ma[de] a judgment call as to what constitutes the 'best' information[,]" here, the Bangladeshi NACA data to value raw shrimp, comprising

---

Mazzetta further contends that, compared to a prior administrative review, nearly [[
        ]] of subject merchandise sold to the United States was vannamei shrimp, which indicates the importance of selecting a SV specific to an input that comprises the majority of sales.  See Consol. Pl.'s Br. at 16–17.  According to Mazzetta, Commerce's failure to "acknowledge the relevance of species-specific sales quantities in determining the importance of the characteristics of the normal value to which those sales are compared" merits remand.  Id. at 18.  However, Commerce addressed this argument in the underlying administrative proceeding.  Commerce noted that sales of subject merchandise do not necessarily equate with the consumption of inputs to make a finished product.  See Final Decision Memo. at 9.  Moreover, Fimex reported that it comingles all shrimp—frozen or raw—at the production stage, meaning that U.S. sales data would not accurately represent Fimex's raw vannamei shrimp consumption.  See Final Calc. Memo. at 3.

the vannamei and black tiger species.  Lifestyles Enter., Inc. v. United States, 751 F.3d

1371, 1378 (Fed. Cir. 2014).

## II.  Commerce's Denials of Separate Rate Status to Certain Names

Vietnamese Respondents contend that Commerce's denials of SR status to

Fimex's full business name, "Sao Ta Foods Joint Stock Company," as well as to two

factory names, "Frozen Seafoods Factory No. 32" and "Seafoods and Foodstuffs Factory"

(collectively, "Thuan Phuoc's factories" or "factories"), are unsupported by substantial

evidence and not in accordance with law.  See Pls.' Br. at 6–7, 24–46.  Defendant and

AHSTAC counter that Commerce reasonably denied SR status to the names.  See Def.'s

Br. at 12, 14, 31–44; see also Def.-Intervenor's Br. at 8, 22–30.  For the reasons that

follow, the court remands for further explanation or reconsideration the denial of SR status

to the factory names "Frozen Seafoods Factory No. 32" and "Seafoods and Foodstuffs

Factory" yet sustains Commerce's denial of SR status to the name "Sao Ta Foods Joint

Stock Company."

### A.  Legal Standard

When Commerce investigates subject merchandise from an NME, such as

Vietnam, Commerce presumes that the government controls export-related decision-

making of all companies operating within that NME.  Import Admin., [Commerce],

Separate-Rates Practice and Application of Combination Rates in Antidumping

Investigations involving [NME] Countries, Pol'y Bulletin 05.1 at 1 (Apr. 5, 2005) ("Policy

Bulletin 05.1"), available at http://enforcement.trade.gov/policy/bull05-1.pdf (last visited

Jan. 9, 2020); see also Antidumping Methodologies in Proceedings Involving [NME]

Countries: Surrogate Country Selection and [SRs], 72 Fed. Reg. 13,246, 13,247 (Dep't Commerce Mar. 21, 2007) (request for comment) (stating the Department's policy of presuming control for companies operating within NME countries); Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997) (approving Commerce's use of the presumption).   Commerce assigns an NME-wide rate, unless a company successfully demonstrates an absence of government control, both in law (de jure) and in fact (de facto).  Policy Bulletin 05.1 at 1–2.[24]

To do so, a company submits a separate rate application ("SRA") or a separate rate certification ("SRC") (collectively, "separate rate forms").[25]  Policy Bulletin 05.1 at 3–4; see also Pls.' Br. at Annex 2 ("SRA"); Pls.' Br. at Annex 3 ("SRC").  Under Commerce's practice, enumerated in Policy Bulletin 05.1 ("policy"), each company that exports subject merchandise to the United States must submit its own individual SRA, "regardless of any common ownership or affiliation between firms[.]"  Policy Bulletin 05.1 at 5.  Commerce limits its consideration to only companies that exported subject merchandise to the United

---

[24] Commerce examines the following factors to evaluate de facto control: "whether the export prices are set by, or subject to the approval of, a governmental authority;" "whether the respondent has authority to negotiate and sign contracts and other agreements;" "whether the respondent has autonomy from the central, provincial and local governments in making decisions regarding the selection of its management;" and, "whether the respondent retains the proceeds of its export sales and makes independent decisions regarding disposition of profits or financing of losses." Policy Bulletin 05.1 at 2.  With respect to de jure control, Commerce considers three factors: "an absence of restrictive stipulations associated with an individual exporter's business and export licenses;" "any legislative enactments decentralizing control of companies;" and, "any other formal measures by the government decentralizing control of companies." Id.

[25] In an SRC, like an SRA, an applicant provides information and supporting documentation that it is not subject to NME control.  See Final Decision Memo. at 19.  Firms that currently hold a separate rate submit an SRC, while firms that do not hold a separate rate or have had changes to corporate structure, ownership, or official company name submit an SRA.  See SRA at 2.

States during the period of investigation or review.[26]  Id. at 4–5.  In addition, the policy sets out the requirement that applicants identify affiliates in the NME that exported to the United States during the period of investigation or review and provide documentation demonstrating that the same name in its SR request appears both on the business registration certification ("BRC") and on shipments declared to U.S. Customs and Border Protection ("CBP").  Id. at 4–5.  The separate rate forms reflect these requirements.  Question two of the SRA, like question seven of the SRC, asks whether the applicant "is identified by any other names . . . (i.e., does the company use trade names)" and requests applicants to provide BRCs and "evidence that these names were used during the [period of investigation or review]."  See SRA at 10; see SRC at 7.

## B. Thuan Phuoc's factories

With respect to the denial of SR status to Thuan Phuoc's factories, Plaintiffs argue that Commerce's determinations are not supported by substantial evidence, because the record indicates that the factories were not separate companies; and, even if they were separate companies, Commerce would have sufficient record evidence to nonetheless grant SR status.  See Pls.' Br. at 26–32.  Plaintiffs further challenge Commerce's determinations as arbitrary and capricious and not in accordance with law, because, in previous administrative reviews, Commerce had granted separate status to the factories, and, further, Commerce failed to provide notice of an SRA deficiency and an opportunity to remedy that deficiency.  See id. at 32–40.  Defendant and AHSTAC counter that

---

[26] Although Policy Bulletin 05.1 refers to investigations, the SRA incorporates Policy Bulletin 05.1 by reference.  See SRA at 2.

Commerce reasonably denied Thuan Phuoc's factories SR status because record evidence indicated that "Frozen Seafoods Factory No. 32" and "Seafoods and Foodstuff Factory" were members of Thuan Phuoc's "group" and not its trade names that could benefit from its SR status.  See Def.'s Br. at 35–40; Def.-Intervenor's Br. at 22–28. Further, Defendant and AHSTAC defend Commerce's determination as not arbitrary and capricious and in accordance with law.  See Def.'s Br. at 40–42; Def.-Intervenor's Br. at 22–28.

Commerce's determination that Thuan Phuoc's factories did not qualify for SR status is unsupported by substantial evidence, because Commerce failed to consider the documentary evidence included with Thuan Phuoc's SRC and explain why, in view of that evidence, the factory names did not qualify as trade names of Thuan Phuoc.  Pursuant to 19 U.S.C. § 1677f-1(c), Commerce assigns dumping margins to "exporter[s]" and "producer[s]" of subject merchandise.  In NME cases, exporters that successfully rebut a presumption of governmental control may avert an NME-wide dumping margin.  See Policy Bulletin 05.1 at 1–2.  Here, it is undisputed that Thuan Phuoc established its eligibility for a separate rate.  If Frozen Seafoods Factory No. 32 and Seafoods and Foodstuff Factory are trade names and therefore the same entity as Thuan Phuoc, then Commerce's finding that Thuan Phuoc operates independently of the government in its export activities would extend to these factories and their trade names.  See id. at 2. Thus, Frozen Seafoods Factory No. 32 and Seafoods and Foodstuff Factory can rebut the presumption of government control by demonstrating that they are trade names or the same entity as Thuan Phuoc.

Here, Thuan Phuoc, an exporter of subject merchandise, requested that it and its factories' names be granted separate rate status.  <u>See</u> [SRC] of [Thuan Phuoc], PD 71, bar code 3572148-01 (May 15, 2017) ("Thuan Phuoc SRC").  Commerce granted Thuan Phuoc SR status but denied the same to its factories, when Thuan Phuoc had indicated the factories were under common ownership, identified them as trade names of Thuan Phuoc, and provided BRCs and export documentation.[27]  <u>See</u> Final Decision Memo. at 22–23; Thuan Phuoc SRC at 1–8.  Commerce, in denying SR status to the factory names, focused narrowly on the instructions to the SRA that define a "trade name" as "other names under which the company does business[,]" exclusive of "names of any other entities in the firm's 'group,' affiliated or otherwise."[28]  <u>See</u> Final Decision Memo. at 18; <u>see also</u> Thuan Phuoc SRC at 5 n.3.  Commerce noted that the factory names appeared on Thuan Phuoc's BRC as "branch factories," which, in its view, indicated that the factories were part Thuan Phuoc's "group," not names under which it does business. Final Decision Memo. at 23.  Therefore, Commerce found that these "branch factories" fell within the exception to the definition of a trade name and could not benefit from Thuan

---

[27] Although, in the narrative portion of the SRC, Thuan Phuoc did not call the factories' names "trade names" or d/b/a names—instead referring to them as "separate factories" or "branch factories"—it checked off the form's boxes indicating that it sought SR status for these factory names through the conduit of "trade names."  <u>See generally</u> Thuan Phuoc SRC.  Thuan Phuoc did entitle one table column with "trade names," and listed the factory names within that category, in its response to question eight of the SRC.  <u>See</u> <u>id.</u> at 6–7.

[28] Commerce preliminary denied SR status to the factories, because it determined that the names were not on a currently valid BRC.  <u>See</u> Trade Names Memo. at 2–4; Prelim. Decision Memo. at 9–10.  However, in the Final Decision Memo., Commerce conceded that it had "inadvertently" miscategorized the reason why it had denied SR status, <u>see</u> Final Decision Memo. at 23 n.100, and, instead, offered a new rationale, recounted above.

Phuoc's SRC; instead, Commerce stated they must submit their own SRAs.   See id.
(quoting Policy Bulletin 05.1 at 5 ("Each applicant seeking [SR] status must submit a
separate . . . individual application regardless of any common ownership[.]")).

Commerce assumed the very point at issue and did not consider record evidence
that detracts from its determination.[29]   Thuan Phuoc supplied documentary evidence that
these factories are trade names, the same entity as Thuan Phuoc. Commerce failed to
consider the copies of the factories' BRCs, each entitled "Certificate of Activities
Registration and Tax Registration of Branch" ("branch certifications"), that Thuan Phuoc
included with its application.[30]   See Thuan Phuoc SRC at Ex. 1.   Although the branch
certifications had registration numbers that differed from that on Thuan Phuoc's BRC,
both branch certifications identified Thuan Phuoc as the "[n]ame of the enterprise."   See
id.[31]   Notably, these individual branch certifications suggest the factories are divisions

---

[29] In the Final Decision Memo., Commerce prefaced its discussion with a generic explanation as
to why it had denied SR status to trade names, including Thuan Phuoc's factories.  None of those
reasons—i.e., non-inclusion of names on BRCs, lack of evidence that the names were used
commercially to export subject merchandise during the POR, and superseding new names
following changed circumstances determinations—appear to apply to Thuan Phuoc.  Final
Decision Memo. at 16.  As Commerce itself notes, Thuan Phuoc's BRC listed the factories'
names. See id. at 23.

[30] Thuan Phuoc's factories' branch certifications have business registration numbers and grant
dates that differ from Thuan Phuoc's BRC.  See Thuan Phuoc SRC at Ex. 1.  Unlike Thuan
Phuoc's BRC, the branch certifications do not have sections regarding registered capital,
abbreviated names, or shareholders.  See id.

[31] Consistent with its prior practice, Commerce considered only the most recently amended BRCs,
because when a company amends its BRC, it surrenders the preceding amendment.  See Final
Decision Memo. at 19–20; see e.g., Certain Frozen Warmwater Shrimp from [Vietnam], 81 Fed.
Reg. 62,717 (Sept. 12, 2016) (final results of [ADD] admin. review, 2014-2015), and
accompanying Issues and Decision Memo. for the Final Results at 79–81, A-552-802 Sept. 6,
2016, available at  https://enforcement.trade.gov/frn/summary/vietnam/2016-21882-1.pdf  (last
visited Jan. 9, 2020).

under the enterprise Thuan Phuoc, rather than members of its "group."  See id.; see also SRC at 7 n.3 (defining "trade name").  Commerce must explain why it nonetheless chose to view Thuan Phuoc's factories as separate entities from, rather than divisions of, Thuan Phuoc, given the factories' branch certifications.

Commerce also did not consider Thuan Phuoc's invoices from the factories, which listed the respective factory name and not Thuan Phuoc's.  See id. at Exs. 2-B–C. According to Policy Bulletin 05.1, an exporter must use the same name as the legal business name in its commercial documents submitted to CBP.  See Policy Bulletin 05.1 at 5 ("All shipments to the United States declared to [CBP] must identify the exporter by its legal business name.  This name must match the name that appears on the exporter's business license/registration documents[.]").  Therefore, these invoices seem to support the factories' claim that they have exported during the POR as a division of Thuan Phuoc. Commerce however disregarded this evidence because it concluded these two factories were distinct entities which were required to file their own SRA.[32]  Here, because Commerce did not appear to consider the information contained in Thuan Phuoc's SRC

---

[32] Vietnamese Respondents contend that Commerce adopted an unreasonable reading of Policy Bulletin 05.1 and the SRA instructions in requiring Thuan Phuoc's factories, which are one-in-the-same as the applicant Thuan Phuoc, to submit separate SRAs.  See Pls.' Br. at 30–31.  As explained above, Commerce's determination that the factories needed to submit individual SRAs is unsupported by substantial evidence, because record evidence does not support its finding that the factories were separate companies part of Thuan Phuoc's "group" rather than trade names of Thuan Phuoc.  See Final Decision Memo. at 22–23.

or the supporting documentation, it unreasonably denied SR status to Thuan Phuoc's

factories.[33]  See Final Decision Memo. at 22–23.[34]

### C. Sao Ta Foods Joint Stock Company

Vietnamese Respondents challenge Commerce's denial of SR status to Fimex's

full business name, "Sao Ta Foods Joint Stock Company," faulting Commerce for not

explaining the basis of its denial.  See Pls.' Br. at 41–46.  Further, Plaintiffs contend its

reliance on Policy Bulletin 05.1 for its determination is contrary to law.  See id.; see also

Pls.' Reply Br. at 20–23.  Defendants and AHSTAC respond that Commerce reasonably

found that Sao Ta Foods Joint Stock Company was not eligible for a SR because there

was no evidence of use of this trade name on the record.  See Def.'s Br. at 42–44; see

also Def.-Intervenor's Br. at 28–30.

---

[33] Vietnamese Respondents contend that Commerce departed from its prior practice in declining to grant SR status to Thuan Phuoc's factories, when, in prior administrative reviews, Commerce had granted the factories SRs.  See Pls.' Br. at 33–37; see also Pls.' Reply Br. at 9–13.  However, it is Commerce's practice to make SR determinations on a segment-by-segment basis and in view of the evidence on that proceeding's record. See Qingdao Sea-Line Trading Co., 766 F.3d at 1387 ("[E]ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record.").

[34] According to Vietnamese Respondents, Commerce was required under 19 U.S.C. § 1677m(d) to provide notice to Thuan Phuoc that its SRA would not also serve as the SRA for its factories and, further, to consider information on the record to nonetheless determine whether the factories were entitled to SR status pursuant to 19 U.S.C. § 1677m(e).  See Pls.' Br. at 37–40.  Given that the court remands the denial of SR status to the factory names, the court does not address whether Commerce had such statutory obligations. Relatedly, the court does not address AHSTAC's contention that this argument is waived, because it was not raised before Commerce. See Def.-Intervenor's Br. at 28.

The court sustains Commerce's determination.   Policy Bulletin 05.1 directs Commerce to consider whether companies are independent from government control with respect to export activities.[35]  Id. at 2.   The policy explains that Commerce's SR test focuses on exporters and export-related decisions, rather than producers and, as such, requires a company to have exported subject merchandise during the POR.  See id. at 1–2. Further, the policy directs Commerce to consider whether a company is independent from government control with respect to its export functions.   Id. at 2.   Commerce, consistent with that policy, requires each SR applicant to provide the name of the exporting entity, and any trade name(s) under which it may export, as identified in its BRC, and demonstrate that such entity name and/or trade name(s) match the name on documents for declared shipments to CBP.  See id. at 5; see also SRA at 10.[36]  Here, although Fimex listed the name "Sao Ta Foods Joint Stock Company" in response to question two of the SRA, it did not include export documentation demonstrating that the name had been used during the POR.  See [SRA] of Sao Ta Joint Stock Company, aka

---

[35] Commerce's test to determine de facto and de jure independence from an NME government focuses on a company's export activities.   See Policy Bulletin 05.1 at 2.   For example, in determining the absence of de facto control, Commerce considers, inter alia, whether the NME government sets or approves export prices.  Id. at 2.

[36] Although Vietnamese Respondents concede that Fimex had not included export documentation with the full business name "Sao Ta Foods Joint Stock Company," they allege that Policy Bulletin 05.1 is arbitrary, both facially and as applied to Fimex.  See Pls.' Br. at 41–46.  Vietnamese Respondents' challenge that there is "no justification" for the policy does not find support.  Id. at 44.   Reasonably, Commerce requires that shipment documentation and BRCs serve as documentary evidence that a name is used by the entity seeking SR status, because Commerce focuses on whether a company's export-related activities are independent from the NME government in order to qualify for a SR.  See Policy Bulletin 05.1 at 1–4.  Fimex, consistent with that policy, was required to provide evidence that it had exported as "Sao Ta Foods Joint Stock Company" to receive a SR for that name.

FIMEX VN at 5, CD 71, bar code 3573086-01 (May 17, 2017).  If a company has not exported, Commerce has nothing to apply its test that assesses independence from the NME government with respect to the company's export functions.  See, e.g., Policy Bulletin 05.1 at 2 (detailing Commerce's test to evaluate the absence of de jure and de facto governmental control).  Commerce reasonably denied SR status to the name "Sao Ta Foods Joint Stock Company" because, as it explained, there was no record evidence that it had been used on export documents during the period of review.  See Final Decision Memo. at 15–21; see also Prelim. Decision Memo. at 10.

## CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that Commerce's final determination with respect to the denial of separate rate status to the names "Frozen Seafoods Factory No. 32" and "Seafoods and Foodstuffs Factory" is remanded for further explanation or consideration consistent with this opinion; and it is further

**ORDERED** that Commerce's final determination is sustained in all other respects; and it is further

**ORDERED** that Commerce shall file its remand determination with the court within 60 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments; and it is further

**PUBLIC VERSION**

      **ORDERED** that the parties shall have 15 days thereafter to file replies to comments on the remand determination.


                                                  /s/ Claire R. Kelly  
                                                Claire R. Kelly, Judge

Dated:January 16, 2020  
       New York, New York